## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ANGEL BUTTERBAUGH, as an ) | |
| individual, and CINDY DOUGLAS, as an ) | |
| individual, ) | |
| Plaintiffs, ) | CIVIL ACTION NO. 03:06-18 |
| v. ) | |
| ) | |
| MICHAEL CHERTOFF, Secretary, ) | JUDGE KIM R. GIBSON |
| United States Department of Homeland ) | |
| Security, ) | |
| Defendant. ) | |

## MEMORANDUM OPINION & ORDER

**Gibson, J.,**

Now before the Court is the Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Document No. 6) from Defendant Michael Chertoff, appearing as the Secretary of the United States Department of Homeland Security ("DHS" or "Defendant"), as well as the opposition thereto (Document No. 8) from Plaintiffs Angel Butterbaugh ("Butterbaugh") and Cindy Douglas ("Douglas", collectively "Plaintiffs") and Defendant's supporting reply (Document No. 11). Plaintiffs filed their Complaint on January 27, 2006, alleging gender discrimination, sexual harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and seeking back and front pay, reinstatement to employment, compensatory damages, attorney fees and costs, and all other relief permitted by law. Document No. 1, ¶¶ 196-208. Jurisdiction is proper under 28 U.S.C. § 1331; venue is appropriate pursuant to 28 U.S.C. § 1391(b). Defendant timely moved for summary judgment on July 31, 2006. Pursuant to the Parties' agreement, the Court stayed all discovery so that it could fully consider the issues presented in Defendant's dispositive motion. Document Nos. 15 & 17. For the following reasons, the Court will grant Defendant's Motion in part and deny the Motion in part.

1

## I. BACKGROUND[1]

Butterbaugh and Douglas were both terminated from their positions with United States Investigations Services, Inc. ("USIS") on March 8, 2005. USIS is a former government entity that became a private, employee-owned corporation on July 7, 1996. As a subcontractor for DHS, USIS provides administrative contract workers for the National Firearms Tactical Training Unit ("NFTTU") in Altoona, Pennsylvania. That facility originally belonged to the Immigration and Naturalization Service but is now part of DHS and United States Immigration and Customs Enforcement ("ICE"). The NFTTU is involved with purchasing, testing, inventorying, and repairing firearms, as well as testing ICE agents in their use of firearms. Of approximately thirty employees working at NFTTU at the time of Plaintiffs' terminations, about half were USIS contract workers and half were directly employed by the federal government.

Butterbaugh first worked at NFTTU in late 1995 under the auspices of the Job Training Partnership Act and the Choices for Single Parents program. During that time she was supervised by government employee Mike Pallo. In April of 1996, Butterbaugh returned to NFTTU as an employee of the private subcontractor Maxima. Thereafter, although various firms obtained and lost contracts to support NFTTU, each hired the trained workers of its predecessor. Thus, no gap in personnel interfered with the work at NFTTU, even as the subcontractor changed several times. Under this system, Butterbaugh worked for several contractors, including Maxima, Telos, Wang Gentronics, and USATREX, but was always employed in the same capacity at NFTTU. In September 2000, USIS

---

[1] Unless otherwise indicated, the facts are taken from Plaintiffs' Complaint and any consistencies between the Parties' filings, as the Court is required to assume the truth of Plaintiffs' allegations and construe all reasonable inferences in their favor. *Sommer v. Vanguard Group*, 461 F.3d 397, 403 (3d Cir. 2006) (articulating the standard for summary judgment); *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989) (articulating the standard for motions to dismiss). Although no indentations or marks are used, the Court has, where appropriate, directly quoted the language of the Parties.

2

assumed the contract for NFTTU and immediately hired Butterbaugh.

As a USIS employee, Butterbaugh sometimes worked under the supervision of Robert Masters ("Masters"), a Training Specialist Armorer employed with DHS. In June 2002, USIS hired Douglas to work at the NFTTU and Douglas also occasionally worked under Masters. Butterbaugh and Douglas both had brief romantic relationships with Masters, in 1997 and 2003, respectively.

Contract workers at NFTTU are treated similarly to the government employees, even with regard to scheduling and leave time. Furthermore, government employees train, oversee, and evaluate the daily work and duties of the independent contractors. During Plaintiffs' tenures at NFTTU, the only onsite USIS management was an employee with little or no control over their daily duties and performances. USIS would periodically warn its employees that they were required to do whatever the government workers asked. Concerned for retaining its contract, USIS also emphasized that in the event of a dispute, it would believe its customer—the federal government—over its own employees.

In their Complaint, Plaintiffs detail an extensive pattern of sexual harassment committed by federal employees at NFFTU—principally Masters, who repeatedly exposed himself, inappropriately touched female contract workers, and made several degrading comments. Butterbaugh and Douglas, along with USIS employees Kristina Starr and MaryAnn Kiel, eventually filed complaints both to their USIS supervisor and directly to federal managers. On the recommendation of a counselor with USIS' Employee Assistance Program, Plaintiffs also reported Masters' conduct to the Altoona Police Department ("APD"). Plaintiffs never mentioned their past relationships with Masters to USIS or NFTTU employees, but did relay that information to the APD.

Plaintiffs believe these complaints negatively affected their treatment at NFTTU, that their jobs were unfairly made more difficult and subjected to greater scrutiny, and that DHS improperly influenced

3

and obstructed the APD's investigation. They assert that DHS employee Carl Michaud, Assistant Director of NFTTU, expressed to USIS' program manager for the NFTTU site Tony Abrams a need to eliminate Plaintiffs' employment. On March 7, 2005, Abrams visited the NFTTU site and, despite assuring all USIS employees that their jobs were secure, notified Butterbaugh and Douglas that he was terminating the two, ostensibly for falsifying information in their harassment complaints. Plaintiffs allege that they were terminated with the input, concurrence, and encouragement of managers within DHS, its predecessor department, or an agency within the DHS.

## II. LEGAL STANDARD

When analyzing a motion under FED. R. CIV. P. 12(b)(6), the issue is not whether the plaintiff will prevail at the end but only whether he should be entitled to offer evidence to support the claim. *Lake v. Arnold*, 112 F.3d 682, 688 (3d Cir. 1997); *Niami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). A claim warrants dismissal only if it is clear that relief would not be available under any set of facts that could be proved consistent with the allegations. *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 81 L. Ed. 2d 59 (1957). When a 12(b)(6) motion is granted, a district court should not dismiss the civil action but instead provide the claimant at least one opportunity to amend the defective complaint. However, when further amendment would be futile, an action or claim may be dismissed with prejudice and that plaintiff barred from raising it again. *Heller v. Fulare*, 371 F. Supp. 2d 743, 746 (W.D. Pa. 2005) (citing CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE & PROCEDURE § 1357 (3d ed. 2004)).

In assessing the propriety of dismissal, the Court must "accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the non-moving party." *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d Cir. 1989);

4

*D.P. Enters., Inc. v. Bucks County Cmty. Coll.*, 725 F.2d 943 (3d Cir. 1984). "In considering a rule 12(b)(6) motion, a court may consider an undisputably authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Steinhardt Group v. Citicorp*, 126 F.3d 144, 145 (3d Cir. 1997).

If the Court considers evidence outside of the pleadings, it may convert the motion to dismiss into a motion made under FED. R. CIV. P. 56. *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). As is the case here, when a motion to dismiss has been alternately framed as a motion for summary judgment and the nonmoving party has submitted evidence extraneous to its pleadings, the Court need not provide the parties with express notice of conversion. *Id.* at 288-89; *Hilfirty v. Shipman*, 91 F.3d 573, 578-79 (3d Cir. 1996).

Summary judgment is appropriate where "there is no genuine issue as to any material fact." FED. R. CIV. P. 56. "An issue of material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (citation omitted). Material factual disputes are those "that might affect the outcome of the suit under governing law." *Id.* On a motion for summary judgment, the moving party must first "identify[] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). To defeat the motion, "an adverse party may not rest upon the mere allegations or denials of his pleading." *Id.* at 321 n.3. Instead, it must use evidence to "set forth specific facts showing that there is a genuine issue for trial." *Id.* "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106

S. Ct. at 2513, 91 L. Ed. 2d at 216.

## III. ANALYSIS

Federal employees may file Title VII lawsuits against executive agencies. 42 U.S.C. § 2000e-16. As with any other Title VII claimant, however, they must first exhaust prescribed administrative remedies before resorting to litigation. *Antol v. Perry*, 82 F.3d 1291, 1295-96 (3d Cir. 1996). Defendant first argues that the Complaint should be dismissed entirely because Butterbaugh and Douglas were not DHS employees for purposes of Title VII. Document No. 7, pp. 6-15. Alternatively, DHS claims that Plaintiffs did not properly exhaust their administrative remedies with regard to potential sexual discrimination and sexual harassment claims. *Id.* at 15-20.

### A. Whether DHS and USIS Jointly Employed Plaintiffs

Courts have developed a variety of tests to help determine whether or not an employment relationship exists for purposes of Title VII. The most common, which Plaintiffs advance, uses thirteen factors borrowed from common-law agency principles to divine the requisite control. As articulated by the Supreme Court, under this test

we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-324, 112 S. Ct. 1344, 117 L. Ed. 2d 581 (1992) (citing *Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730, 751-52, 109 S. Ct. 2166, 104 L. Ed. 2d 811 (1989)). *See also Walters v. Metro. Educ. Enters.*, 519 U.S. 202, 211, 117 S. Ct. 660, 136 L. Ed.

2d 644 (1997) (applying *Darden* to Title VII).

In a second test, a variant of which Defendant proposes, courts ask whether or not "one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer." *NLRB v. Browning-Ferris Indus., Inc.*, 691 F.2d 1117, 1123 (3d Cir. 1982). Though the central question of *Browning-Ferris* seems identical to that of *Darden*, different factors guide the analysis. Courts in the Third Circuit have distilled the *Browning-Ferris* joint-employer test into the following three factors: "1) authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; 2) day-to-day supervision of employees, including employee discipline; and 3) control of employee records, including payroll, insurance, taxes and the like." *Cella v. Villanova Univ.*, No. 01-7181, 2003 U.S. Dist. LEXIS 2192, at *22 (E.D. Pa. Feb 12, 2003).

A third test, the "single-employer test" attempts to discern when technically distinct entities in fact represent a unified enterprise that can be considered a single employer. *Nesbit v. Gears Unlimited, Inc.*, 347 F.3d 72, 86 (3d Cir. 2003). Neither party suggests the application of this test, which is more tailored to unraveling purposefully convoluted corporate structures. *See Browning-Ferris*, 691 F.2d at 1122 ("[T]he 'single employer' standard is relevant to the determination that separate corporations are not what they appear to be, that in truth they are but divisions or departments of a single enterprise." (citation omitted)).

While *Walters* makes clear that the *Darden* common-law test applies whenever a particular defendant's number of employees is in dispute, Pennsylvania courts have been something less than consistent when that issue is not in question. *Compare, e.g.*, *Cimino v. Borough of Dunmore*, No. 02-

7

1137, 2005 U.S. Dist. LEXIS 40049, at **16-25 (M.D. Pa. Dec. 21, 2005) (applying *Darden* to determine whether defendant jointly employed an independent contractor hired by a private employer) *and Silviotti v. Morning Call, Inc.*, No. 01-4692, 2002 U.S. Dist. LEXIS 24410, at **11-19 (E.D. Pa. Dec. 12 2002) (same) *with Cella v. Villanova Univ.*, No. 01-7181, 2003 U.S. Dist. LEXIS 2192, at **21-22 (E.D. Pa. Feb 12, 2003) (applying *Browning-Ferris* in a similar situation) *and Fromm v. MVM, Inc.*, No. 04-1315, 2004 U.S. Dist. LEXIS 30024, at **29-32 (M.D. Pa. Dec. 14, 2004) (same). Though the issue recently came before the Third Circuit, that Court did not have the opportunity to decide under what circumstances courts should prefer one test to the other. *Wilson v. MVM, Inc.*, 475 F.3d 166, 173 (3d Cir. 2007).

In the private sector, the different policy interests behind Title VII generally and 42 U.S.C. § 2000e(b) in particular suggest to the Court that the particular statutory provision in question should determine the applicable test. Subsection 2000e(b) defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees. . . ." According to the Third Circuit, the fifteen-employee minimum arises from Congress' intent to exempt small businesses from the strains of comprehensive federal regulation. *Nesbit*, 347 F.3d at 85 (noting that "a significant purpose of the fifteen-employee minimum in the Title VII context is to spare small companies the considerable expense of complying with the statute's many-nuanced requirements" (citations omitted)). *Cf. Clackamas Gastroenterology Assocs., P.C. v. Wells*, 538 U.S. 440, 447, 123 S. Ct. 1673, 155 L. Ed. 2d 615 (3002) ("[T]he congressional decision to limit the coverage of the [ADA] to firms with 15 or more employees has its own justification that must be respected—namely, easing entry into the market and preserving the competitive position of smaller firms."). A defense based on § 2000e(b) indicates that a particular lawsuit threatens to expand Title VII beyond its congressional design. Thus, when the

8

question is not whether the defendant employed the plaintiff, but whether the defendant employed a sufficient number of other people to meet the requirements of subsection (b), the more scrutinous thirteen-factor common law test governs. *Walters*, 519 U.S. at 211.

For "employee," Title VII offers this definition: "The term 'employee' means an individual employed by an employer. . . ." As the Supreme Court has noted, this definition "is completely circular and explains nothing." *Darden*, 503 U.S. at 323. In contrast to 2000e(b), however, subsection (f) contains nothing that obviously cabins the operation of Title VII, leaving intact the full sway of the statute's remedial purpose. *Kromnick v. Sch. Dist.*, 739 F.2d 894, 909 (3d Cir. 1984) (noting the Supreme Court's instruction that "the language of Title VII must be read against the broad remedial purpose envisioned by Congress" (citation omitted)). *See also Robinson v. Shell Oil Co.*, 519 U.S. 337, 344 n.4, 346, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997) (adopting a more capacious definition of "employee" under 42 U.S.C. § 2000e-3(a) because it was "more consistent with the broader context of Title VII"). Accordingly, a less rigid analysis, such as that set forth in *Browning-Ferris*, might be appropriate under § 2000e(f).

Of course, § 2000e(b) is of little concern to litigants pursuing Title VII claims against the federal government. In this context, the threshold question of whether or not the defendant is an employer subject to the statute's "many-nuanced requirements" will never arise. *See* 42 U.S.C. § 2000e(b) ("The term 'employer' . . . does not include the United States. . . ."); 42 U.S.C. § 2000e-16 ("All personnel actions affecting employees or applicants for employment . . . in executive agencies . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin."). The only question in cases such as Plaintiffs' is whether they were *employees*, not whether defendant was an *employer*. But there is nothing to suggest that the definition of "employee" changes depending on the identity of

9

the defendant. Thus, in choosing the proper test for discerning whether Plaintiffs were Defendant's employees, the Court still looks to § 2000e(f).

The Court's taxonomy—applying *Darden* to § 2000e(b) and Browning-Ferris to § 2000e(f)—helps explain why a rose may not be a rose may not be a rose. *See EEOC v. Zippo Mfg. Co.*, 713 F.2d 32, 35 (3d Cir. 1983) (channeling Gertrude Stein and lamenting that there is no consistent common law definition of employee). It does so, however, cognizant that the Supreme Court has "abandon[ed its former] emphasis on construing ["employee"] in the light of the mischief to be corrected and the end to be attained." *Darden*, 503 U.S. at 325. The Court's consideration of Title VII's remedial nature does not risk "unmooring" its definition of "employee" from the common law, as *Darden* cautions it should not do. *Id.* at 324. Whatever gulf exists between the common-law agency test and the joint-employment test, though perhaps not insignificant, does not violate the basic principle that "the precise contours of an employment relationship can only be established by a careful factual inquiry." *Graves v. Lowery*, 117 F.3d 723, 729 (3d Cir. 1997). Indeed, when it set out the common-law agency test in *Darden*, the Supreme Court noted that "all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." *Darden*, 503 U.S. at 324 (citations omitted).

Thus, another rationale for preferring the joint-employment test, independent of any statutory parsing, is the Ninth Circuit's conclusion that *Darden*'s common-law agency test is simply "ill-suited for determining whether an individual, who is indisputably an employee of an independent contracting entity that provides employees to perform services for the government, is also an employee of the government." *Lopez v. Johnson*, 333 F.3d 959, 963 (9th Cir. 2003) (citing *Redd v. Summers*, 232 F.3d 933, 938-40 (D.C. Cir. 2000)). Of the six factors in the *Darden* test that do not seem wholly encompassed by the joint-employment test—skill required; the source of the instrumentalities and tools;

10

the duration of the relationship between the parties; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business—four seem somewhat out of place in the context of privately supplied administrative staffing: skill required; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; and whether the hiring party is in business. By applying the joint-employment test of *Browning-Ferris*, the Court is not rejecting *Darden*'s common-law agency analysis, but simply reordering and prioritizing its various factors.

This preference for the joint-employment test finds additional support in a series of Rehabilitation Act cases against the United States Marshals Service, in which courts have given the *Lopez dicta* particular traction. *See, e.g., Int'l Union v. Clark*, No. 02-1484, 2006 U.S. Dist. LEXIS 64449, at **21-31 (D.D.C. Sept. 11, 2006) (applying the joint-employment test); *Strolberg v. Akal Sec. Co.*, No. 03-0004, 2005 U.S. Dist. LEXIS 35373, at **18-26 (D. Ida. Jan. 19, 2005) (reaching the same conclusion under both tests); *McMullin v. Ashcroft*, 337 F. Supp. 2d 1281, 1293-94 (D. Wyo. 2004) (applying the joint-employment test); *Fromm v. MVM, Inc.*, No. 04-1315, 2004 U.S. Dist. LEXIS 30024, at **29-32 (M.D. Pa. Dec. 14, 2004) (same); *Walton v. USMS*, No. 03-1460, 2004 U.S. Dist. LEXIS 30026, at **7-12 (N.D. Ca. Jan. 15, 2004) (applying both tests). *But see Wilson v. MVM, Inc.*, No. 03-4514, 2004 U.S. Dist. LEXIS 6409, at *7 (E.D. Pa. Apr. 2, 2004) (same), *vacated on other grounds*, 2004 U.S. Dist. LEXIS 9242 (applying *Reid*); *Leitch v. MVM, Inc.*, No. 03-4344, 2004 U.S. Dist. LEXIS 14307, at **14-16 (E.D. Pa. July 22, 2004) (same).

The Court's analysis of Defendant's relationship with Plaintiffs will therefore focus on three factors: "1) authority to hire and fire employees, promulgate work rules and assignments, and set conditions of employment, including compensation, benefits, and hours; 2) day-to-day supervision of

11

employees, including employee discipline; and 3) control of employee records, including payroll, insurance, taxes and the like." *Cella v. Villanova Univ.*, No. 01-7181, 2003 U.S. Dist. LEXIS 2192, at *22 (E.D. Pa. Feb 12, 2003).

### 1. Authority to Hire and Fire

While Plaintiffs concede that they were hired by USIS, they argue that DHS maintained significant power over personnel decisions. Document No. 8, p. 14. The contract between the government and USIS requires the latter to submit "a [personnel and staffing] plan describing procedures to obtain and maintain a workforce capable of performing the work required under this contract." Exh. 3 attached to Document No. 7, p. 15. The plan addressed, among other things, employee recruitment, retention, and qualifications. *Id.* While the implication is clear that it is the contractor's responsibility to provide the workforce, it is equally clear that the government did retain considerable influence over the contours of that workforce. For instance, USIS was obligated to "incorporate Government comments into the [personnel and staffing] plan[]." *Id.* at 15. The government also set specific qualification standards for each position USIS contracted to staff, *id.* at 16-19, and could veto new hires on the basis of those qualifications. *Id.* at 19. Where appropriate, the government also reserved the right to conduct urine and blood tests on USIS workers. *Id.* at 21; Exh. 4 attached to Document No. 7, p. 4. Finally, the government required USIS to implement a phase-in plan by which the contractor would achieve a sufficient performance level within a set period of time and with "minimum disruption of [NFTTU] operations." *Id.* at 16. Indeed, the government insisted that operations at NFTTU "continue without interruption" during the phase-in and phase-out stages. *Id.* at 19. The "phase-in" plan was to address "employee staffing actions during transition," *id.*, and, again, had to incorporate all relevant government comments. *Id.* at 15. The effect of this "phase-in"

requirement clause was to make it likely that USIS, as its predecessors had done, would simply hire the private workers already staffing positions at NFTTU.

DHS may have been without the power to directly hire USIS employees. Furthermore, Plaintiffs' evidence does not demonstrate that DHS directly fired any USIS employee. Though Defendant may have influenced the termination of certain contract workers, "[t]he simple fact that a major client can pressure an employer into firing a particular individual does not transmute that client into that individual's employer." *Morrison v. Magic Carpet Aviation*, 383 F.3d 1253, 1255 (11th Cir. 2004). However, the ability to screen contract workers through the use of performance standards and other qualifications militates in favor of finding an employment relationship. *Fromm*, 2004 U.S. Dist. LEXIS 30024, at **31-32. DHS clearly retained some control over the private workforce at NFTTU through its ability to amend USIS' personnel and staffing plan, set parameters for the transition period between contractors, and vet new hires for compliance with applicable qualifications. Moreover, a USIS worker would presumably face some adverse consequence for failing a government-required urinalysis. A reasonable jury could therefore conclude that DHS' degree of control effectively constituted the ability to decide whether USIS employed a particular worker.

### 2. Promulgate Work Rules and Assignments, Day-to-Day Supervision, and Hours

According to the contract between USIS and the government, "[USIS] personnel rendering services under this order are not subject to supervision or control by Government personnel. . . . The contractor shall provide all necessary supervision, management, technical, and administrative support to accomplish the[ir] requirements." Document Exh. 3 attached to Document No. 7, p. 14.

Butterbaugh and Douglas, however, argue that reality was quite different, and each avers that DHS personnel regularly supervised, evaluated, and assigned work to USIS employees. Butterbaugh

Aff., Document No. 8-3, ¶¶ 13, 14, 16-18, 20, 22; Douglas Aff., Document No. 8-4, ¶¶ 5, 8, 12, 13, 16, 17, 38. According to Douglas, DHS employees told her "what to do, how to do it, where to do it, and what hours to work." Douglas Aff., ¶ 5. Douglas also states that she had "very limited contact with [USIS on-site manager] Julie Leutenegger . . . [who] gave me no directions on how to do my work [or] what work was to be done." *Id.* at ¶ 7. Douglas maintains she "was directly supervised . . . by [DHS Management and Program Analyst] Diane Chewning . . . . [who] prepared my performance evaluations," "controlled my hours of employment based on policy set by [DHS Program Manager] Carl Michaud," "selected contract employees to . . . travel to other sites," "gave specific instructions on how we were to perform our jobs," and "supervised and controlled my work in almost all aspects, even as to when I took my lunch break." *Id.* at 8-9, 12, 14, 16, 38. Douglas also states that her "overtime was approved not by Julie Leutenegger but by [DHS Supply Management Specialist] Ronald Beegle." *Id.* at ¶ 17.

Similarly, Butterbaugh indicates that no USIS employee oversaw her work, but that she was supervised at various times by DHS employees, including Chewning, Michaud, Beegle, Masters, and others. Butterbaugh Aff., ¶ 16-18, 20. Both Butterbaugh and Douglas also recount ways in which DHS made no distinction between government and contract workers. *Id.* at ¶¶ 23, 24, 26; Douglas Aff. ¶¶ 30, 35; *see also* Starr Aff. ¶¶ 29, 53.

In support of its position, DHS offers the affidavits of NFTTU Director Thomas Trotto, Michaud, Chewning, Beegle, and DHS Criminal Investigator Ronald Fortin, all of whom aver that they had no day-to-day supervision over USIS employees. Exh. 2, 7-10 attached to Document No. 7. Each of Defendant's affiants states generally that, to the best of their knowledge, USIS contract workers were supervised by USIS on-site supervisors and that USIS was solely responsible for, among other things,

14

hiring, firing, and disciplining contract workers; approving annual and sick leave for contract workers; and approving the work schedules for, evaluating the performance of, and giving additional assignments to the contract workers. *See, e.g.*, Chewning Aff., Exh. 8 attached to Document No. 7, ¶ 5.

"A ruling on a summary judgment motion should not amount to a trial by affidavit." *United States v. Kobaly*, No. 83-2334, 1987 U.S. Dist. LEXIS 15019, at *6 (W.D. Pa. Apr. 7, 1987) (citing *Adickes v. S. H. Kress & Company*, 398 U.S. 144, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970). The Court's responsibility at this juncture is simply to determine whether genuine issues of material fact exist for trial, and a reasonable jury surveying the evidence now before the Court could find that DHS was responsible for the day-to-day supervision of USIS workers and set many of their conditions of employment, such as work rules, assignments, and hours.

## 3. Compensation and Benefits, Employee Records, and Employee Discipline

The contract between USIS and DHS does permit government review of the "amount of performance incentive award to be passed on to employees if the performance incentive becomes available," as well as the outline of available employee benefits (health coverage, vacation policy, etc.)." Exh. 3 attached to Document No. 7, p. 15. While Plaintiffs do not argue that DHS set or took responsibility for their compensation, Butterbaugh and Douglas suggest that this review power indicates that "NFTTU had some oversight over what employee benefits were provided." Document No. 8, p. 14. Defendant offers the affidavits of three DHS employees familiar with the contract, who state that, to the best of their knowledge, the government "had none of the following responsibilities with respect to USIS contract employees: a) Determining or paying salaries; b) Withholding federal and/or state income tax on behalf of USIS employees; c) Determining or providing health and/or life insurance benefits; or d) Determining or providing retirement benefits and/or pensions." Trotto Aff., Exh. 2

15

attached to Document No. 7, ¶ 5; Beegle Aff., Exh. 9 attached to Document No. 7, ¶ 7; Fortin Aff., Exh. 10 attached to Document No. 7, ¶ 6. Trotto also states that DHS did not "[m]aintain[] personnel records relating to USIS contract employees." Trotto Aff., ¶ 5. As already described, each of Defendant's affiants avers that USIS was solely responsible for disciplining the contract workers at NFTTU. Plaintiffs have not argued that they were subject to formal discipline directly from DHS.

While these considerations weigh in Defendant's favor, they do not outweigh the issues of material fact that attend the other circumstances of Plaintiffs' employment. Because the Court's review at this juncture is limited to discerning whether there remain questions suitable for a jury's attention, and because the Court finds that a reasonable jury could find that DHS controlled substantial elements of Plaintiffs' employment, the Court cannot hold that Defendant is insulated from this Title VII lawsuit as a matter of law.

While today's holding is rooted in the joint-employment test of *Browning-Ferris*, the Court notes that consideration of the *Darden* factors not encompassed by the foregoing analysis would only give Plaintiffs additional support. NFTTU sent Butterbaugh and Douglas to specialized training courses. Butterbaur Aff. ¶ 6; Douglas Aff. ¶ 37. There is evidence that NFTTU provided the instrumentalities that USIS contract workers used during their work. Douglas Aff. ¶ 36; Starr Aff. ¶ 11. The relationship between the Parties lasted for years, and Plaintiffs' supporting duties were closely involved with NFTTU's regular course of business. It is therefore clear that under either of the definitions for "employee" that have been argued to the court, a genuine issue of material fact exists as to whether Plaintiffs were DHS employees.

## B. Whether Plaintiffs Exhausted Their Administrative Remedies

In Count I of their Complaint, Butterbaugh and Douglas allege that DHS "unlawfully

16

discriminated against Plaintiffs because of their sex and because they complained of unwelcome sexual harassment." Document No. 1, ¶ 199. The Complaint further claims that Plaintiffs were terminated in retaliation for their Title VII complaints and that DHS "intentionally and deliberately terminated Plaintiffs because of their sex and their complaints of discrimination." *Id.* at ¶ 202. The factual history recounted in the Complaint also describes a long period of alleged sexual harassment and retaliation. *Id.* at ¶¶ 21-195. Given the liberal rules of pleading,[2] Plaintiffs' Complaint can fairly be said to state Title VII claims for gender discrimination, sexual harassment, retaliatory harassment, and retaliatory discharge.

Defendant argues that because Plaintiffs' complaint to the Equal Employment Opportunity Commission ("EEOC") included only an allegation of retaliation, the Court should "dismiss plaintiffs' sexual discrimination claims, as well as any claim for hostile work environment." Document No. 7, p. 15. "Because plaintiffs' claims of sexual harassment and discrimination are not fairly within the scope of their EEOC charges, these claims should be dismissed and plaintiffs should be left with only a claim for retaliation." Document No. 11, p. 15.

"The parameters of the civil action in the district court are defined by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976) (citations omitted). "Because the aim of the statutory scheme is to resolve disputes by informal conciliation, prior to litigation, suits in the district court are limited to matters of which the EEOC has had notice and a chance, if

---

[2] Pursuant to FED. R. CIV. P. 8, Plaintiffs' Complaint need only offer "a short and plain statement of the claim showing that the pleader is entitled to relief." District courts are thus empowered to discern theories of recovery from the facts that a claimant presents. *Evans Products Co. v. W. Am. Ins. Co.*, 736 F.2d 920, 923 (3d Cir. 1984) ("Adherence to the rigid theory-of-the-pleadings doctrine has been abolished by the Federal Rules of Civil Procedure.").

appropriate, to settle." *Anjelino v. New York Times Co.*, 200 F.3d 73, 93 (3d Cir. 1999). Thus, the Third Circuit has held that the allegations of a Title VII complaint must "fall fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Atkinson v. Lafayette Coll.*, 460 F.3d 447, 453 (3d Cir. 2006) (adopting the test for determining whether a claimant is required to exhaust administrative remedies with regard to discriminatory acts that occur during the pendency of a case (citing *Antol v. Perry*, 82 F.3d 1291, 1295 (3d Cir. 1996))).

In *Atkinson*, the court affirmed the dismissal of a Title VII claim where the plaintiff had complained to the EEOC only of retaliation for "her opposition to gender inequity in the funding of [the defendant's] sports programs." *Atkinson*, 460 F.3d at 453. The plaintiff's EEOC charge "pertained only to the treatment of coaches of women's sports, as opposed to the treatment of coaches who were women." Similarly, in *Antol* the plaintiff complained to the EEOC "of non-selection for promotion based upon an alleged physical handicap (seizure disorder). Mr. Antol did not raise the issue of sex discrimination at the informal counseling stage of the administrative process." The plaintiff's administrative charge, therefore, could "not fairly encompass a claim for gender discrimination," in part because "[n]either the EEOC nor the agency were put on notice of a gender discrimination claim." *Antol*, 82 F.3d at 1295-96.

As *Antol* suggests, whether or not the EEOC has notice of a potential claim is highly probative, given the statute's preference for resolving disputes by informal conciliation and without litigation. To fulfill Title VII's notification requirement, an administrative charge need only make the EEOC cognizant "of the full scope of the situation during its settlement efforts." *Id.* at 94. Thus, in *Anjelino*, the plaintiffs could proceed on their claim of sexual harassment because their complaint to the EEOC cited discrimination "'with respect to wages, benefits, abusive atmosphere and other terms and

18

conditions of employment, because of sex and retaliation.'" *Id.* at 84. Though the claimants' EEOC filing did not describe or specify any particular instance of harassment, the court held that the use of a single term—"abusive atmosphere"—was sufficiently precise to bring the subsequent sexual harassment claim within the scope of the administrative charge. *Id.* at 95.

In the wake of *Anjelino*, one court found a claim for sexual harassment within the scope of an EEOC complaint that described the source and general nature of the harassment. *Mroczek v. Bethlehem Steel Corp.*, 126 F. Supp. 2d 379, 385 (E.D. Pa. 2001). Though the plaintiff had only checked the "retaliation" box on her EEOC complaint and limited her formal charges to retaliation for previous complaints, the Court found in *dicta* that the description of sexual harassment was enough to exhaust the administrative remedies for a sexual harassment claim. *Id. Cf. Visnikar v. Dep't of Envtl. Prot.*, No. 02-963, 2004 U.S. Dist. LEXIS 3645, at *19 (W.D. Pa. Jan. 27, 2004) (dismissing plaintiff's sexual harassment claim where "the EEOC charge does not identify a single remark or any other sexually harassing conduct towards the Plaintiff that would have put either the EEOC or the Defendants on notice that this type of claim served as the basis of her action"); *Mullen v. Topper's Salon & Health Spa, Inc.*, 99 F. Supp. 2d 553, 556 (E.D. Pa. 2000) (same).

In their charge to the EEOC, both Plaintiffs left unmarked the box for sexual discrimination and sexual harassment, checking only the box for reprisal. Butterbaugh Complaint, Exh. 6a attached to Document No. 7, p. 2; Douglas Complaint, Exh. 6b attached to Document No. 7, p. 2. Both added, however, that the reprisal was for complaining of sexual harassment. Exh. 6a at 2; Exh. 6b at 2. Moreover, in their explanation of why they believed they were discriminated or retaliated against, Butterbaugh and Douglas each stated that "I . . . was subjected to sexual harassment from Robert Masters, an employee of NFTTU." Exh. 6a at 3; Exh. 6b at 3. Plaintiffs also described the extent of

19

that harassment: "Masters continued to harass me, as well as other female employees, by improperly touching me, exposing his erect penis to me, and speaking to me in a sexual way, which I objected to as unwarranted. Exh. 6a at 3; Exh. 6b at 3. Additionally, the statements cover the alleged consequences of their complaints: "My government supervisor . . . began to treat me adversely after I complained about Masters. . . . [leading] to USIS and NFTTU, as joint employers, retaliating against me for my complaints by firing me. Exh. 6a at 3; Exh. 6b at 3-4.

The failure to check a particular box is not fatal to a Title VII action, and courts in the Third Circuit liberally construe EEOC charges. *Schouten v. CSX Transp., Inc.*, 58 F. Supp. 2d 614, 616 (E.D. Pa. 1999) (citations omitted). The Court thus finds it reasonable to conclude that an investigation into Plaintiffs' administrative complaints would have encompassed the allegations of sexual harassment. Both Butterbaugh and Douglas described the nature and extent of the harassment and identified its particular source. The extent and specificity of the conduct recounted in Plaintiffs' statements to the EEOC provided the notice of potential claims that the exhaustion requirement is meant to ensure. The subsequent civil claims for retaliatory discharge, retaliatory harassment, and sexual harassment— premised on facts identical to those set forth in the EEOC charges—are therefore within the scope of those charges and have been administratively exhausted.

The Court recognizes that Plaintiffs' EEOC charges, wherein harassment serves as a predicate for the retaliation charge, are distinguishable from the one in *Anjelino*, which directly complained of ongoing abuse. As one court has noted:

> An administrative complaint limited exclusively to a claim of retaliation is not likely to trigger an investigation of the underlying discriminatory treatment of which the plaintiff complained. This is because a victim of retaliation need only demonstrate that he was engaging in protected activity by making complaints of discrimination, not that the complaints were meritorious.

*Dixit v. City of New York Dep't of Gen. Servs.*, 972 F. Supp. 730, 734 (S.D.N.Y. 1997). The Eighth Circuit addressed such circumstances in *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218 (8th Cir. 1994), wherein the plaintiff had filed a complaint with the EEOC alleging retaliation for the filing of a previous EEOC complaint. Though Williams' subsequent lawsuit stated a claim for racial discrimination, she had checked only the "retaliation box" on her second EEOC complaint and made no reference to race or discrimination. *Williams*, 21 F.3d at 223. The court thus held that "the only claim properly addressed by EEOC administrative processes was that of retaliation" and dismissed Williams' discrimination claim for failure to exhaust. *Id. See also Duncan v. Delta Consol. Indus.*, 371 F.3d 1020, 1026 (8th Cir. 2004) (relying on *Williams* in holding that "charges of sexual harassment generally are not like or reasonably related to retaliation charges for complaining about antecedent harassment . . . . [R]eference to past harassment is simply insufficient to put the EEOC or [employer] on notice of the charge.").

Even among those courts that draw such formal distinctions between different species of claims, however, specific factual allegations can bring an uncharged allegation within the fold of a formally stated EEOC complaint. In the words of the Second Circuit, "the relationship between a retaliation claim in an EEOC complaint and a subsequently-articulated gender discrimination claim is not one based on a *per se* rule. It is instead one intimately connected to the facts asserted in the EEOC complaint." *Williams v. N.Y. City Hous. Auth.*, 458 F.3d 67, 71 (2d Cir. 2006). The principle question remains: "whether the complaint filed with the EEOC gave that agency adequate notice to investigate discrimination on both bases." *Id.* at 70 (citation omitted). By including in their EEOC charges enough factual detail to put that agency on notice of a potential claim for sexual harassment, Plaintiffs adequately exhausted their administrative remedies.

21

The same cannot be said for any gender discrimination claim, however. Neither Butterbaugh or Douglas complained to the EEOC of discrimination on the basis of gender. That agency could not have been put on notice of such claims, and the Court cannot now allow Plaintiffs to seek relief on that basis. This conclusion does not contradict the Court's finding that Plaintiffs may state a claim for sexual harassment, an element of which requires that they demonstrate "intentional discrimination because of their sex." *Andrews v. Philadelphia*, 895 F.2d 1469, 1482 (3d Cir. 1990). For one, whether or not Plaintiffs have exhausted their administrative remedies for a particular claim is a separate issue from whether or not they can establish the elements of that claim. For another, the Court may be able to presume such discrimination in this case, given the nature of the alleged harassment. *Id.* at 1482 n.3 ("The intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course.").

## IV. CONCLUSION

Having considered the evidence now on the record, the Court is obligated to convert the Motion *sub judice* into one made under Fed. R. Civ. P. 56. Having done so, the Court finds that there is a genuine issue of material fact regarding whether DHS employed Plaintiffs for purposes of Title VII. Moreover, the Court finds that Plaintiffs' claims for retaliation, retaliatory harassment, and sexual harassment are within the scope of the charges filed with the EEOC. Any claim of sexual discrimination, however, must be barred for failure to exhaust the proper administrative remedies.

An appropriate Order follows.

22

**AND NOW**, this 20th day of March, 2007, upon consideration of Defendant Michael Chertoff's Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Document No. 6), **IT IS HEREBY ORDERED** that the Motion is **DENIED** in part and **GRANTED** in part. The Motion is granted to the extent that Plaintiffs have not exhausted the proper administrative remedies for their claim of gender discrimination. Count I is therefore dismissed to the extent that it seeks recovery on that basis. Defendant's Motion is denied in all other respects.

**BY THE COURT:**

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**

**Cc:    All counsel of record**

23